# MEMORANDA

OF

*CAUSES DECIDED DURING THE PERIOD EMBRACED IN THIS VOLUME, WHICH ARE NOT REPORTED IN FULL.*

---

JOHN H. RIKER, Executor, etc., Respondent, *v.* SAMPSON SIMPSON LEO, THE NORTH AMERICAN RELIEF SOCIETY, etc., Impleaded, Appellant.

Whether words in a will attached to a gift, explaining the design of the testator in respect to its use or disposition, constitute a limitation, or are to be regarded as advisory or recommendatory only, depends upon the intention of the testator as ascertained from a consideration of all the provisions of the will bearing upon the subject.

Where the words used in the charter of a corporation defining its powers have a common and well understood meaning, and are free from ambiguity and doubt, they may not be enlarged so as to embrace other subjects, by or in view of the tenets of any sect or the personal belief of the incorporators.

(Argued February 3, 1892; decided April 12, 1892.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made June 26, 1891, which affirmed a judgment in favor of defendant Sampson S. Leo entered upon a decision of the court on trial at Special Term.

This action was brought to obtain a judicial construction of the will of Sampson Simpson, deceased.

It is reported upon a former appeal in 115 N. Y. 90. Judgment absolute was ordered for Sampson S. Leo, defendant. Subsequently a motion for reargument was denied, but the remittitur therein was amended so as to grant a new trial.

By the provision of the will in question the testator left a certain fund in trust for the support of a nephew during life. Upon his death the executors were directed to pay the same "to any responsible corporation in this city, existing at the time of the death of my said nephew, whose permanent fund

is established by its charter for the purpose of ameliorating the condition of the Jews in Jerusalem, Palestine, and I desire such corporation annually to transmit the interest received on said $50,000, to Jerusalem, Palestine, to ameliorate the condition of the Jews living there by promoting among them education, arts and sciences, and by learning them mechanical and agricultural vocations.  *  *  *  In case my disposition of the $50,000, as provided by the last clause of this, my will, shall fail and not take effect, then I give and bequeath the said principal sum of $50,000 equally to the children of my niece Jochebed, M. Simpson Leo," etc.

Defendant, The North American Relief Society for the Indigent Jews in Jerusalem, Palestine, the object of whose incorporation, as claimed in certificate of incorporation, is to contribute "to the relief of indigent Jews in Palestine," claimed the trust fund, as did also defendant Sampson S. Leo, who is the only child of the testator's niece Jochebed.

The following is the opinion in full:

" This case is before the court for the second time.   On the former appeal the court reversed the judgment of the General Term on the ground that the North American Relief Society did not answer the description of the corporation mentioned in the fifth clause of the will of Sampson Simpson (115 N. Y. 94), and was not, therefore, entitled to the fund of $50,000. The case went back for a new trial, and on the new trial judgment was rendered against the claim of the North American Relief Society.   Upon the new trial evidence was given, not presented on the former trial, which it is claimed authorizes and requires that the words ' relief of the indigent Jews in Jerusalem, Palestine ' contained in the certificate of incorporation of the North American Relief Society, should have a broader interpretation than that given to them on the former appeal, and it is insisted that in the light of the new evidence it should be held that the society is entitled to the legacy in question.

" The will of Sampson Simpson, which was executed in January, 1857, a few days prior to the testator's death, in the fifth clause, directs that on the death of his nephew Moses A. Isaacs, the legacy of $50,000 (the income of which was given

to the nephew for life), should be paid by his executors 'to any responsible corporation in this city (New York) existing at the time of the death of my nephew, whose permanent fund is established by its charter for the purpose of ameliorating the condition of the Jews in Jerusalem, Palestine; and I desire such corporation annually to transmit the interest received on said $50,000 to Jerusalem, Palestine, to ameliorate the condition of the Jews living there by promoting among them education, arts and sciences, and by learning them agricultural and mechanical vocations.' It is claimed that the case, as now presented, shows that in the contemplation of the incorporators of the North American Relief Society, of whom the testator, Sampson Simpson, was one, the words in the certificate, 'relief of the indigent Jews in Jerusalem, Palestine,' were synonymous with the words subsequently used by the testator in his will to express the purpose to which his legacy was to be devoted.

"It is insisted that the words used in the certificate are to be construed in the sense in which they were understood by the incorporators, and that so construed the corporate powers of the society extend to the administration of a fund for the amelioration of the condition of the Jews in Jerusalem by means of education and instruction in agricultural and mechanical vocations, although, in the absence of explanation, they might have a narrower interpretation.

" It is further insisted that it was the intention of the testator that the North American Relief Society should receive the legacy, provided the society should be in existence and a responsible corporation at the death of the nephew. The argument that the words 'relief of indigent Jews,' used in the certificate of incorporation, comprehend the apparently wider purpose of benevolence manifested in the scheme of the testator in his will, rests upon evidence given upon the last trial by learned divines of the Jewish Church, explaining the conception of charity as taught in the Talmud and accepted by orthodox Jews. It is unnecessary to state in detail the very interesting testimony upon this subject. It is sufficient to say that it was shown that from early times it has been the doctrine of the Jewish teachers that the true way of administering

charity is by furnishing opportunities to the poor and dependent to become self-supporting, and by aiding and encouraging them to fit themselves for some handicraft, or to engage in agricultural or other business, or to do any labor, however humble, to gain their bread. The giving of alms is discouraged, except in cases of actual necessity, and is deemed the lowest form of charity.

"It is probable that this same view of charity exists among Christian communities. But with the Jews it seems to a greater extent to have the explicit sanction of the law of the Jewish Church. It is, therefore, claimed that the words in the certificate of incorporation of the North American Relief Society, 'relief of indigent Jews' means relief according to the Jewish method, by means of education, provision for the instruction of the poor of their race in some self-supporting trade or vocation, and that in a subordinate sense only do they refer to their temporary relief by the giving of alms.

"The words in the will are, it is insisted, a paraphrase merely of the words of the certificate, and the identity of the corporation claiming the legacy with the one described in the will is by the evidence referred to claimed to be established.

"We have reached the conclusion that the case is not changed in its legal aspect by the new evidence given on the second trial.

"It was held on the former appeal that the particular purposes designated by the testator in the fifth clause of his will, for which he desired the income of the fund of $50,000 to be applied, constituted an essential part of the testator's scheme, and that no corporation could take the legacy except one authorized to effectuate his plan of amelioration in the way pointed out. This construction has strong support in the language used by the testator in providing for a disposition of the fund in the contingency that there should be no corporation existing at the death of his nephew, of the character previously described. In that case he empowered his executors to pay over the legacy to the Jews' hospital in Palestine, or any corporation or trust company which should consent to receive the legacy and 'apply the interest in accordance with my instructions above expressed,' provided his executors should

be satisfied that in that way 'my intention to ameliorate the condition of the Jews can be accomplished.' Whether words in the will attached to a gift explaining the desire of the testator in respect to its use or disposition, constitute a limitation of the bequest, or are to be regarded as advisory or recommendatory only, depends upon the intention of the testator and they are construed as mandatory or advisory according to the intention as ascertained from a consideration of all the provisions of the will which bear upon the subject. (See *Colton* v. *Colton*, 127 U. S. 300.) We perceive no reason for changing our former view upon this point.

"The court in the former appeal also held that the administration of the fund, according to the directions of the will, was not within the corporate powers possessed by the North American Relief Society. The words in the certificate of incorporation of the society, to express the corporate object of the association, viz. : The 'relief of the indigent Jews in Jerusalem, Palestine,' in their ordinary interpretation, import the bestowal of charity upon the poor by administering to their personal and temporary distresses, and do not describe those benevolent schemes for the permanent elevation of that class through education and instruction and employment in vocations and thereby convert them from a condition of dependence into self-supporting men and women. It does not seem to be seriously contested that the words of the certificate of incorporation do not in their usual acceptation embrace those wider purposes of benevolence. The contention is that they are to be construed according to the special and peculiar meaning attached to them by the Jewish teachers and in the light of the Jewish conception of charitable relief. We are aware of no authority justifying a construction of corporate powers by or in view of the tenets of any sect, or which authorizes a limited or broad construction depending upon the personal belief of the incorporators, or their understanding of the words used in the statute creating the corporation or in a certificate of incorporation under a general law, where the words used in defining the powers of the corporation have a common and well understood significance and are free from ambiguity and doubt.

"The common and accepted meaning of words is that which is to be followed. Any other rule of construction would be attended with great danger. Corporate powers would be asserted which were never intended to be granted, and if the special understanding of the incorporators of the meaning of the words should be admitted to qualify or enlarge their ordinary and natural meaning, it might often be found that powers which were never thought of by the legislature would be hidden away under words which never suggested them.

"But passing this consideration, we are not satisfied that the incorporators of the North American Relief Society intended to use the words 'relief of the indigent Jews' in any other than their natural and ordinary sense. The record is filled with evidence that in 1853, when the society was incorporated, the Jews inhabiting Jerusalem were in a condition of abject poverty, and hunger and nakedness was the condition of nearly the entire Jewish population of that ancient city, consisting of six or seven thousand souls. Many of them had gone there to die in the holy city. To the Jews it was the place of the holiest associations. Though the belief of the restoration of the race to the land of their fathers has perhaps with many weakened 'into a hope,' the race throughout the world turned to Judea with longing for the re-establishment of the kingdom of Israel. In 1853, there was pressing need and the Jews of the Western World were constantly appealed to to relieve the distress and poverty of their brethren in the East. Their civil rights were curtailed, they were cut off from the ordinary avenues of industry, and starvation was their inevitable doom unless they were assisted by the charity of the outside world. In the condition of this population at that time, there was, therefore, abundant reason for a movement which resulted in the organization of the North American Relief Society for the purpose of furnishing means for relieving indigence and want. The men who organized this corporation were educated, intelligent Jews, versed in the principles, traditions and litera ture of Judaism and prominent in all movements of benevolence and charity looking to the relief and elevation of their race. The claim that the incorporators of the North American Relief Society had something other in view in organizing

it than the furnishing of temporary relief against poverty and destitution, is based to a great extent upon the fact that in 1852, a movement was commenced by Sir Moses Montifiore and others to establish schools and industrial vocations and to promote agriculture in Palestine as a means of accomplishing permanent relief of the Jewish inhabitants. This movement was strongly supported by the 'Occident,' the leading Jewish periodical in this country, to which Sampson Simpson was a subscriber. It was urged that this plan was much preferable to that which had prevailed for many years, of giving alms for the temporary relief of the destitute Jews of the East. The inference we are asked to draw from the facts connected with this movement and shown in the evidence is that Sampson Simpson and his associates in organizing the North American Relief Society, intended thereby to aid this movement and that they could not have designed to organize a charity to administer relief according to the old method. But it is to be observed that the new movement had, in 1853, hardly taken root. There is no direct evidence that Sampson Simpson, or his associates in the society, had taken any part in it. There was a wide and pressing demand for the relief of immediate want and destitution among the Jews in Jerusalem, and relief of this kind would always be required for the poor, sick, decrepit and aged people, however much might be accomplished in the direction of permanent relief of the community at large by bettering their educational and industrial condition. We think, on considering the whole evidence, it would be too much to say that the incorporators in the North American Relief Society had any other view in organizing it, except to furnish relief to indigence in the ordinary way and according to the common understanding of the phrase.

"When in 1857, Sampson Simpson came to make his will he had undoubtedly become interested in the new movement which had been under discussion for five years and which had taken shape in the establishment, under the guidance of Sir Moses Montifiore and many other philanthropic men, of schools and industrial enterprises in Palestine, for the benefit of the Jews. The will is drawn manifestly under its influence. The question has been asked, to which we have heard no satisfac-

tory answer, why the testator did not designate this corporation as the beneficiary, if he supposed the powers of the society organized in 1853, of which he was president to his death, were adequate to carry out the purposes of his will, or if he intended the bequest to go to that society. The suggestion that he could not know that it would be in existence at the time of the death of his nephew, or if then in existence be a responsible corporation, and that, therefore, he omitted to name it as the beneficiary, seems improbable. He could have given the legacy to the society subject to the condition that it should be a responsible corporation at the time the gift was to vest in possession. The more natural conclusion is that the testator looked, for the creation of a new corporation to take the legacy with the power to execute the broader purpose he had in view.

"We feel compelled to affirm the present judgment."

*Louis Marshall* for appellant.

*John E. Parsons* for respondent.

ANDREWS, J., reads for affirmance.

FINCH, GRAY and O'BRIEN, JJ., concur; EARL, Ch. J., PECKHAM and MAYNARD, JJ., dissent.

Judgment affirmed.